IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

RONALD P. HOXIE,  )
)
       Plaintiff,  )   TC-MD 210218N
)
  v.  )
)
CLATSOP COUNTY ASSESSOR,  )
)
       Defendant.  )  **DECISION**

Plaintiff appealed the real market value (RMV) of property identified as Account 12048 (subject property) for the 2020-21 tax year. A trial was held on May 18, 2022, in the courtroom of the Oregon Tax Court. Plaintiff appeared and testified on his own behalf. Steve Gibson (Gibson), senior appraiser, appeared and testified on behalf of Defendant. Plaintiff's Exhibit 1 and Defendant's Exhibit A were received without objection.

## I. STATEMENT OF FACTS

The subject property is the former Beacon Hotel, a two-story mixed-use building in Seaside, Oregon. (Ptf's Ex 1 at 1; Def's Ex A at 1.) It was built in 1920 and renovated beginning in 2013. (*Id.*) During renovations, Plaintiff installed an elevator, a new stairwell, refinished the banquet hall, and added skylights. (Def's Ex A at 5.) The parties considered the renovations complete as of the January 1, 2020, assessment date. (*Id.*) The first floor is 5,677 square feet and consists of a pub (or restaurant) space and two retail spaces. (*Id.*) The northeast retail space has street frontage, and the southeast retail space has alley frontage. (*Id.*) The second floor is 5,767 square feet and consists of office space, a banquet hall with a catering area, and communal bathrooms. (*Id.*) The subject property's 2020-21 tax roll RMV was $1,353,615, and its maximum assessed value was $964,246. (Compl at 2.) Plaintiff appealed to the Board of

Property Tax Appeals, which sustained the tax roll values. (*Id.*) Plaintiff requests a RMV of $650,000. (*Id.* at 1.) Defendant requests a RMV of $1,466,282. (Def's Ex A at 1.)

A.      *Plaintiff's Evidence*

Plaintiff has been a real estate developer for decades. He testified as to the actual monthly rent received in 2020 for the subject property: $850 per month for the northeast retail space with street frontage; $500 per month for the southeast retail space with alley frontage; $2,700 per month for the pub; and $700 per month for the second-floor office space. Plaintiff could not provide an exact amount for the banquet hall because he rented it out sporadically for events. Plaintiff testified that Defendant's estimate of the cost to renovate the subject property was likely accurate, but the cost was not reflective of value. He could not sell the subject for the amount Gibson had concluded, noting he would have if he could.

Plaintiff also submitted an appraisal report by Louis J. Moscato, MAI, (Moscato), though Moscato did not testify at trial. (Ptf's Ex 1.) Moscato valued the subject property using only the income and sales comparison approaches, explaining that "investors of properties like the subject do not analyze them based upon depreciated costs * * *." (Ptf's Ex 1 at 12.) He determined the cost approach was unhelpful for calculating value. Moscato concluded that, "as improved, the subject does not represent the highest and best use of the subject site due to the cost associated with renovating the second floor versus the rent that can be obtained." (*Id.* at 42.) Nevertheless, he treated the current use as the highest and best use (HBU). (*Id.*)

1.      *Sales comparison approach*

Moscato found that "there were few sales in Seaside consisting of two-story buildings with similar locational and physical characteristics as the subject." (Ptf's Ex 1 at 44.) Due to the difficulty in finding comparable sales, he placed less weight on this approach. (*Id.*) Only one of

Moscato's six sales was located in Seaside, with the rest in Astoria. (*Id.* at 62.) Four of the six properties were two or three stories, and all six reflected multi-tenant use. (*Id.* at 46-61.) The sale in Seaside was Salmonberry Square, an 11,237-square foot two-story building constructed in 1965 as a furniture store and renovated into a "retail mall" with multiple spaces in 2004-05. (*Id.* at 46.) It sold for $67.77 per square foot in January 2018. (*Id.* at 62.) The six sales occurred between May 2017 through March 2018, reflecting sales prices from $50.27 to $81.67 per square foot of estimated rentable area. (*Id.*) Moscato was unable to determine "an appropriate time adjustment," but noted that "some upward adjustment for market conditions is considered warranted" based on the January 1, 2020, valuation date. (*Id.*) Moscato concluded a value of $77 per square foot or $670,000 under the sales comparison approach. (*Id.* at 65.)

2.    *Income approach*

Moscato considered six comparable properties as well as the subject's actual rents in determining market rent for the subject property. Five of his six comparable rentable properties were mixed-use, multi-tenant buildings with leases to tenants such as a salon, a coffee house, a massage studio, and H&R Block. (Ptf's Ex 1 at 67.) Four of the six were in Seaside. (*Id.*) One of the properties – Salmonberry Square – was two stories, with an 1,820-square foot space on the first floor leased to a pub for $13.19 per square foot starting August 2018 and a 1,080-square foot second floor space leased to a massage business for $8.33 per square foot starting June 2019. (*Id.* at 69-70.) Moscato attributed the lower second floor rent to the lack of street exposure. (*Id.* at 70.) Rents for the six properties ranged from $8.33 to $15.31 per square foot, modified gross. (*Id.*) The subject property's rents ranged from $7.22 to $13.97 per square foot, depending on usage and size. (*Id.* at 70-71.)

/ / /

Moscato concluded the subject property would lease for $14.00 per square foot for the retail space with street frontage; $11.50 per square foot for the pub space; $7.00 per square foot for the rear, alley-facing retail space; $10.00 per square foot for the second-floor office; and $8.00 per square foot for the second-floor banquet hall space. (Ptf's Ex 1 at 70-71.) Subtracting vacancy and credit loss, and expenses, he calculated net operating income (NOI) of $55,097 and multiplied that by a market-derived overall capitalization rate of 8.45 percent, for an indicated value of $650,000 under the income approach. (*Id*. at 77.)

3. *Reconciliation*

Due to a lack of comparable sales in Seaside, Moscato placed little weight on the sales comparison approach. (Ptf's Ex 1 at 78.) He put the most weight on the income approach because investors typically use it to evaluate multi-tenant property. (*Id*.) Moscato concluded that the subject property's RMV as of January 1, 2020, was $650,000. (*Id.*)

B. *Defendant's Evidence*

Gibson's appraisal report does not include a HBU analysis, but it reflects a conclusion that the HBU of the second-floor banquet space is conversion to office space. (*See* Def's Ex A at 15.) He explained that Plaintiff's addition of the elevator is vital to use of the second floor as office space. (*See also id.*) Gibson used all three approaches to value.

1. *Sales comparison approach*

Gibson considered five comparable sales, reflecting retail, office, and restaurant mixed-use. (Def's Ex A at 16.) Three of the properties were in Seaside, close to the subject, but single level. (*Id.* at 16-19.) The other two properties were in Astoria and in Cannon Beach, each multi-level. (*Id*.) The sales occurred from December 2015 to November 2021 and Gibson adjusted for market conditions (time), location, quality, condition, building area, and floor area ratio. (*Id.* at

16.) He wrote, "[w]hile there isn't a 'perfect' comparable, these comps all have similar characteristics indicating a value range from $123.95 to $143.35 per square foot." (*Id*.) Gibson chose the median value of $129 per square foot and concluded a value of $1,476,276. (*Id*.)

Gibson reviewed the comparable sales selected by Moscato, explaining why he did not consider any of them comparable to the subject property. (Def's Ex A at 21-28.) Even though the Salmonberry Square building had been remodeled, he found it still suffered from "extensive functional obsolescence with the largely open [first] floor and staircase access to the [second] floor mezzanine." (*Id.* at 21.) Other comparable sales suffered from functional obsolescence and required significant repairs and updates. (*See id.* at 22-23.) Gibson rejected two of the sales based on vacancy at the time of sale or a history of vacancy. (*See id.* at 24-26.)

2.    *Income Approach*

Due to the subject's mixed-use, Gibson considered multiple different property types to determine market rent for each of the subject's discrete uses. (Def's Ex A at 9.) He separately considered retail, restaurant, and office rent, seemingly based on single-use occupancy, except for rent comparable 11, which was his sale in Cannon Beach. (*Id.* at 9-11.) For example, one restaurant was a standalone Taco Time. (*Id*. at 10.) Gibson found annualized rent of $14 for retail space, $15.75 for restaurant space, and $18 for office space. (*Id*. at 9.) Subtracting vacancy and credit loss, and expenses, he calculated NOI of $120,856 and multiplied that by a market-derived overall capitalization rate of 7.45 percent for value of $1,621,634. (*Id*. at 15.)

Consistent with his HBU conclusion, Gibson subtracted the cost of transforming the banquet hall into office space. (Def's Ex A at 15.) Using the Marshall & Swift cost estimator, he calculated it would cost $40.70 per square foot, or $155,352, to convert the banquet hall into office space. (*Id*.) Gibson subtracted that amount from the indicated value under the income

approach, concluding a value of $1,466,282 for the subject property.  (*Id.*)

3.  *Cost Approach*

Gibson found the cost approach applicable because the subject "has been totally remodeled and renovated."  (Def's Ex A at 20.)  He found the subject property's effective age to be 13 years.  (*Id.* at 1.)  Gibson used the Marshall & Swift cost estimator to determine the subject improvement value and deducted 17 percent depreciation.  (*Id*. at 8.)  For cost calculations, he broke the subject's occupancy into office, retail, bar/tavern, and banquet hall.  (*See id.*)  Gibson determined the value of "raw land" and added the cost of on-site developments, concluding a land value of $339,950 for the subject property.  (*Id.*)  Adding that to the improvements, he concluded a value of $1,492,911 under the cost approach as of January 1, 2020.  (*Id*.)

4.  *Reconciliation*

Although all three approaches indicated a similar value, Gibson placed primary weight on the income approach. (Def's Ex A at 20.)  He testified that the cost approach was a reasonable indication of value due to the complete remodel, and the sales comparison approach tested the reasonableness of his conclusions under the other approaches.  Gibson concluded that the subject property's value was $1,466,282 as of January 1, 2020.  (*Id.*)

## II.  ANALYSIS

The issue is the subject property's RMV for the 2020-21 tax year.  RMV is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."  ORS 308.205(1).[1]  The assessment date for the 2020-21 tax year was January 1, 2020.  *See* ORS 308.007; 308.210. RMV is determined using three methods: the cost,

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2019.

sales comparison, and income approaches. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003).

Although all three approaches to value must be considered, not all three apply to each property.

OAR 150-308-0240(2)(a).

The party seeking affirmative relief bears the burden of proof by a preponderance of the

evidence. ORS 305.427. Plaintiff bears the burden of proof with respect to his requested RMV

reduction, and Defendant bears the burden of proof with respect to its requested RMV increase.

A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing

evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). Evidence that is inconclusive or

unpersuasive fails to meet the burden of proof. *See Reed v. Dept. of Rev.*, 310 Or 260, 265, 798

P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct

valuation on the basis of the evidence before the court, without regard to the values pleaded by

the parties." ORS 305.412.

As this court has stated, "it is not enough for a taxpayer to criticize a county's position.

Taxpayers must provide competent evidence of the RMV of their property." *Woods v. Dept. of

Rev.*, 16 OTR 56, 59 (2002) (citing *King v. Dept. of Rev.*, 12 OTR 491 (1993)). "Competent

evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other

distinguishing differences, and competent testimony from licensed professionals such as

appraisers * * *." *Yarbrough v. Dept. of Rev.*, 21 OTR 40, 44, (2012).

A.      *Highest and Best Use*

HBU is the first question to be addressed because it impacts the selection of comparable

sales and leases. OAR 150-308-0240(2)(i); *Hewlett-Packard Co. v. Benton County Assessor*, 21

OTR 186, 188 (2013). HBU is "the reasonably probable use of vacant land * * * that is legally

permissible, physically possible, financially feasible, and maximally productive, which results in

the highest real market value." OAR 150-308-0240(1)(e). Moscato concluded that the subject property as improved "does not represent the highest and best use of the subject site due to the cost associated with renovating the second floor versus the rent that can be obtained." (Ptf's Ex 1 at 42.) It is unclear how he accounted for that conclusion in his appraisal report, and he was not available to explain at trial. Gibson also concluded that the subject property, as improved, did not represent its HBU, determining that the second-floor banquet hall should be converted to office space. Plaintiff did not challenge Gibson's HBU conclusion, thus the court accepts that the HBU of the subject property is mixed-use with first floor retail and second floor office space.

B.    *Sales Comparison Approach*

The sales comparison approach derives the subject property's value by comparing it to the sales of other similar properties. *Magno v. Dept. of Rev.*, 19 OTR 51, 58 (2006). "[T]he sales comparison approach relies on sale prices of other properties that can serve the same highest and best use as the subject property." *Hewlett–Packard Co. v. Benton County Assessor*, 357 Or 598, 603, 356 P3d 70 (2015). To be comparable, properties should be "similar in size, quality, age and location" to the subject property. *Richardson v. Clackamas County Assessor*, TC–MD 020869D, WL 21263620 at *3 (Or Tax M Div Mar 26, 2003).

Moscato selected sales of two-story, multi-tenant, mixed-use properties similar to the subject property. However, only one was in Seaside and each of the sales required "some upward adjustment" due to market changes between 2017 and 2018, and January 1, 2020. (Ptf's Ex 1 at 63.) It is unclear in the report where Moscato adjusted for market changes, and he was not available at trial to clarify the issue. In his review of Moscato's sales, Gibson noted that several suffered from functional obsolescence, significant deferred maintenance, and chronic

/ / /

vacancy. Taking those factors together, the court finds Moscato's value conclusion under the sales comparison approach is likely understated and given little weight.

Gibson also selected mixed-use properties similar to the subject. Two were two-story but located outside of Seaside. The other three were single-story but located in Seaside. The sales reasonably reflect the value of the subject property at its highest and best use. However, Gibson failed to subtract the necessary costs of converting the subject property's banquet hall into office space. "If the subject property requires some expenditure immediately after the purchase to reach its full utility, the adjustment amount is subtracted from the sale prices of all comparable sales that do not require a similar expenditure to adjust those transactions for differences from the subject property." *The Appraisal of Real Estate* 386, (15th ed 2020). In his income approach analysis, Gibson concluded it would cost $155,352 to convert the banquet hall into office space. This is not a negligible amount, and a prospective buyer would account for the expense in the purchase price. Gibson's value conclusion under the sales comparison approach is inflated due to his failure to deduct the cost associated with achieving the subject property's HBU.

Accepting Gibson's cost estimate to convert the banquet hall into office space, the court finds an indicated value of $1.3 million, rounded, under the sales comparison approach.[2]

C.      *Income Approach*

The income approach is based on what a hypothetical investor believes the property would produce in income. *Allen*, 17 OTR at 253. Both parties focused primarily on the income approach, using the direct capitalization method. The key components of this method are the NOI and the capitalization rate. *Id*.

/ / /

---

[2] That is Gibon's value conclusion of $1,476,276 minus the cost of $155,352 equals $1,320,924.

The NOI is calculated by determining the property's gross income and deducting the operating expenses. *Allen,* 17 OTR at 254. "To calculate the NOI, appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data." *Id.* Moscato selected primarily multi-tenant properties with a mix of uses similar to the subject property. His market rents aligned with the subject property's actual rents. However, Moscato's analysis does not reflect the highest and best use of the second-floor banquet space: converting into to office space. Thus, his NOI conclusion of $55,097 is likely somewhat understated.

Gibson calculated NOI of $120,856 based on rents achieved by single-use and standalone buildings. He testified that he did not have access to comparable rental properties with a similar mix of uses as the subject, so he isolated each of the uses of the subject to determine rent. That method discounts differences between single-use and multi-use properties. In addition, smaller buildings tend to command higher prices per square foot compared to larger ones.[3] *See, e.g., Kohl's Dept. Stores v. Washington County Assessor*, TC-MD 130220D, WL 196150 at *10 (Or Tax M Div, Jan 14, 2015) (noting appraiser testimony that "larger buildings generally sell for a lower unit price than smaller ones"). It is unclear from Gibson's report if he made any size or other adjustments to his comparable rental properties. Gibson applied the same retail rental rate to each of the subject's retail spaces without distinction for size or exposure, even though the retail space with street frontage leased for more than the rear space on the alley. Plaintiff credibly testified that the lack of street frontage for the rear space reduced the achievable rent.

Gibson discounted the subject property's actual rents without offering a persuasive reason why they did not reflect the market. He mentioned lease-up periods and management

---

[3] Gibson's comparable properties range in size from 1,092 to 6,210 square feet, except for the one multi-tenant property located in Cannon Beach, which was 20,765 square feet. (Def's Ex A at 9.)

issues as reasons why a newly remodeled building might not achieve market value but did not clearly explain how those issues impacted the subject property, particularly given that subject property was leased up with the exception of the banquet hall. Based on Gibson's reliance on single-use properties and his failure to account for the subject property's actual rent, the court finds that his value conclusion under the income approach is likely overstated.

Having concluded that the parties' comparable rental rates are unreliable, the court need not develop an analysis as to the appropriate capitalization rate. The court finds the income approach evidence inconclusive and is unable to determine a value under this approach.

D.    *Cost Approach*

The cost approach looks to the estimated value of the land and the cost of constructing a replacement minus depreciation. *Magno*, 19 OTR at 54. "The cost approach is 'particularly useful in valuing new or nearly new improvements,'" but is "less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." *Id*. at 55 (citations omitted). Only Gibson prepared a cost approach, finding the subject property's value to be $1,492,911. Plaintiff agreed the cost estimate was probably accurate, though he disagreed that it reflected value because the building was not worth the money he spent renovating it. The court agrees with Plaintiff that the cost indicator tends to overstate the subject's value in this case. The parties agreed that the second-floor banquet space was not the HBU of the subject property, so the cost approach reflects an over-improved building that requires additional work to achieve its HBU.

E.    *Reconciliation*

The subject property is income-producing, and a potential buyer would likely find the income approach most persuasive. Unfortunately, the income approach evidence presented was inconclusive due to unreliable evidence of market rent for the subject property at its HBU. The

sales comparison approach evidence better reflects the value of the subject and indicated a value of $1.3 million. The cost approach indicated a value of $1,492,911, an accurate reflection of the as-is cost but an overstatement of value because the banquet hall was not the subject's HBU.

"As has often been said, 'true cash value' is a range of value, rather than an absolute." *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977). The evidence presented indicates that the tax roll RMV of $1,353,615 is within the range of the subject's true RMV as of January 1, 2020. As such, no change to the subject property's RMV is supported in this case.

### III. CONCLUSION

Upon careful consideration, the court concludes that neither Plaintiff nor Defendant has proven by a preponderance of the evidence that the subject property's 2020-21 tax roll RMV was in error. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

IT IS FURTHER DECIDED that Defendant's request to increase RMV is denied.

_____

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Presiding Magistrate Boomer and entered on August 12, 2022.*